UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:08-CR-1 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| LEE ALMANY | ) | |
| | ) | |

## <u>MEMORANDUM</u>

Defendant Lee Almany ("Defendant") is scheduled for sentencing on June 19, 2008. Because of the proximity of his sentencing date the Court deems it appropriate to memorialize the reasons for its decision to disqualify Defendant's former counsel, Herbert S. Moncier ("Moncier" or "defense counsel").

Defendant's case was initially before District Judge J. Ronnie Greer in the Greeneville Division of this court. His trial was scheduled for January 16, 2008 before Judge Greer.

Almost immediately upon his entry in this case, the Government filed a motion, seeking an on-the-record inquiry as to whether Herbert S. Moncier, Defendant Lee Almany's counsel,[1] had a conflict of interest in representing Defendant, and whether Moncier could continue to represent

---

[1]Moncier did not represent Defendant initially. After his arrest and appearance on these charges in federal court, Defendant completed a financial affidavit (Court File No. 4) on September 13, 2007, was determined to be indigent, and a Criminal Justice Act (CJA) panel attorney, Boyd Venable, was appointed to represent him (Court File No. 5). Over the next three months, Mr. Venable represented Defendant and filed a number of motions on his behalf. On December 17, 2007, Moncier filed a Notice of Appearance of Counsel (Court File No. 115), stating he had been retained not by Defendant but rather by Defendant's family members to assist Mr. Venable. On the following day, December 18, 2007, Mr. Venable was released from the case (Court File Nos. 116, 118).

Defendant in light of any such conflict (Court File No. 117).[2]  On January 9, 2008, the Court

conducted a hearing to inquire into the matter, and determined a conflict existed which precluded

Moncier from continuing to serve as Defendant's counsel, and disqualified him (Court File Nos.

138, 158).


## I.    FACTS

Defendant Almany was indicted for twenty-one offenses relating to drug trafficking (Court

File No. 110).  Those offenses involved substantive counts of distribution of cocaine, a conspiracy

to distribute cocaine, and the possession of firearms in furtherance of the cocaine distribution and

conspiracy (*id.*).  The offenses carried serious consequences; for example, four of the offenses for

which Defendant was charged carry a minimum sentence of thirty years.  *See* 18 U.S.C. §

924(c)(1)(B)(ii).

On December 18, 2007, the Government moved for an inquiry as to whether Moncier should

be disqualified due to a conflict of interest (Court File No. 117).[3]  Moncier was representing Gary

---

[2]This motion was filed while Judge Greer presided over the case.  On December 24, 2007, defense counsel filed a motion to disqualify Judge Greer and the Magistrate Judge assigned to the case (Court File No. 123).  On January 2, 2008, Judge Greer entered an order of recusal in the case (Court File No. 132).  On the next day the Court, taking into account the trial schedules of the judges in the district, reassigned the case to itself.  In view of the fast approaching trial date of January 16, 2008, and out of a desire to maintain that trial date if at all possible, the Court set the hearing on the motion at the first available date with due regard for the schedules of counsel (Court File No. 133). After the hearing, counsel for co-defendant Johnny D. Moss and the Government asked that Moss's case be transferred back to Judge Greer for the purpose of acceptance of a guilty plea and sentencing.  On January 31, 2008 the Court granted that request and reassigned Moss's case to Judge Greer (Court File No. 144).  The Court retained Defendant's case (Court File Nos. 144, 147).

[3]The Government alleged a number of reasons why Moncier was operating under a conflict of interest and should be disqualified from representing Defendant.  However, in view of the Court's decision regarding the conflict of interest posed by Moncier's simultaneous representation of

2

Musick ("Musick"), an alleged co-conspirator, whose case was on appeal at that time. *United States v. Musick*, No. 05-5563 (6th Cir. Docketed April 13, 2005). Musick was convicted following a trial in this district. *United States v. Musick*, No. 2:03-cr-62-8 (E.D. Tenn. 2003). Moncier argued Musick's appeal on October 24, 2007, and filed supplemental documentation with the United States Court of Appeals for the Sixth Circuit as recently as December 13, 2007.

In support of its motion, the Government proffered a variety of evidence including transcripts of trial testimony, and letters and other documents obtained during the Government's investigations (Court File Nos. 117, p. 2; 136, Exhibits; Exhibits presented at the January 9, 2008 hearing). From the evidence presented, the Court found there was substantial evidence of a relationship between Defendant and Musick, and such evidence indicated this relationship included drug-related activity, the very crux of Defendant's charged offenses. One convicted drug trafficker, Jeremy Jones, had stated he obtained cocaine from both Defendant and Musick (Court File No. 117, p. 2). Others had stated they obtained cocaine from Musick, always meeting him at locations near Defendant's residence (Court File Nos. 117, p. 3; 136, pp. 1-3). Musick used two automobiles which were purchased under Defendant's name (Court File No. 136, pp. 2, 3). Defendant had continued contact with Musick during Musick's incarceration, including Defendant sending money to Musick (Court File No. 117, p. 2).

On January 9, 2008, this Court held a hearing to determine whether there was a conflict of interest due to Moncier's representation of both Musick and Defendant, and whether that conflict

---

Defendant and Musick, two clients with antagonistic interests, the Court did not delve into the other reasons provided by the Government and offers no opinion as to whether they were sufficient grounds for disqualification (*e.g.*, Court File No. 136, pp. 7 (pertaining to who may have hired Moncier, who paid his fees, and the source of those fees), 8-9 (pertaining to associations between Mr. Moncier and Defendant's brother, William Glen Almany)).

precluded Moncier from representing Defendant (Court File No. 158). The Court heard from both the Government and Moncier. The Government stated Defendant and Musick were part of at least one common conspiracy, and provided substantial evidence supporting such a conclusion. Moncier seemed to argue any conspiracy in which Defendant and Musick were both involved in occurred earlier, so as not to be relevant in this case. However, Moncier provided very little pertinent evidence to support his argument, despite repeated invitations by the Court to do so (*see id.*). From the evidence presented and the representations of the Government, it appeared that Musick was higher in the hierarchy of the conspiratorial organization than was Defendant. Based upon the arguments and evidence, the Court determined that both an actual and a potential conflict of interest existed.

The Court then proceeded to question Defendant under oath about his understanding of the potential conflict (Court File No. 158, pp. 38-57). The Court inquired as to Defendant's understanding of his right to conflict-free representation and his right to have an attorney who was solely devoted to his interest. The Court inquired into numerous aspects of the conflict, breaking the issues down into four specific phases of criminal litigation where problems from conflicts would arise: the pre-trial, trial, sentencing, and appeal phases.

### 1.     Pre-trial

The Court extensively questioned Defendant as to his understanding of certain conflicts manifesting during the pre-trial stage, including the problems of divided loyalty, since Moncier would be unable to counsel Defendant as to his best interest where his actions might conflict with the best interests of Musick (*id.*, pp. 38-48). The Court questioned Defendant as to his knowledge of the possibility and benefits of, and his interest in, cooperating with the government (*id.*).

## 2. Trial

The Court also addressed conflicts as they manifest in the trial stage (*id.*, pp. 48-52). The Court addressed multiple consequences of the conflict, including: Moncier's conflicted choice of whether to call Musick to testify at trial, for fear Musick might say something that could be used against him; Moncier's inability to effectively cross-examine Musick, if the government called Musick as a witness, and to generally object to or contradict statements Musick might make, including statements which Defendant may know to be false; and, Moncier's general inability to lessen Defendant's culpability in the eyes of the jury in the offenses by attempting to shift that blame onto Musick (*id.*).

## 3. Sentencing

The Court continued, discussing problems arising from conflicts in the sentencing stage (*id.*, pp. 52-54). This included Moncier's limitations on arguing Defendant played a minor role in comparison to Musick (*id.*, p. 52), and Moncier's inability, not only to call Musick to testify if it would be beneficial to Defendant, but also even to fully and objectively consider whether doing so would benefit Defendant because of his conflict (*id.*, p. 53). The Court also discussed limitations placed upon Defendant in cooperating with the Government to secure a downward departure based upon substantial assistance Defendant might be able to provide, because such assistance may not be in Musick's best interests (*id.*, pp. 53-54).

## 4. Appeal

The Court finally discussed with Defendant the problems a conflict could create in the appellate phase, including Defendant's limitations or complete inability to seek a new trial based upon ineffective assistance of counsel, where Moncier's conflicts prevented Defendant from

receiving full and competent legal counsel (*id.*, pp. 54-55).

Defendant was then asked if he had any questions for the Court, and responded that he did not (*id.*, p. 56). From Defendant's responses, demeanor, and hesitation with respect to many of the questions, the Court had concerns as to whether Defendant fully understood the dangers and ramifications of the conflict posed by defense counsel's representation.

## II.    APPLICABLE LAW

### A.    Conflict of Interest

"[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant. . ." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Although a defendant has a qualified right to be represented by the counsel of his choosing, this right must be balanced with the right to a defense conducted by an attorney who is free of conflicts of interest. *See Serra v. Mich. Dep. of Corrections*, 4 F.3d 1348, 1352 (6th Cir. 1993), *cert. denied*, 510 U.S. 1201 (1994) (*citing Wheat*, 486 U.S. at 157). Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 44(c)(2)[4] requires the Court to take appropriate action to protect a defendant's right to counsel, unless there is "good cause to believe no conflict of interest is likely to arise."[5] The rule does not specify what

---

[4] Fed. R. Crim. P. 44(c)(2) reads in full: "The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel."

[5] Fed. R. Crim. P. 44(c), detailing the appropriate procedure for addressing joint representation, i.e. the simultaneous representation of two or more co-defendants by a single attorney occurring in the same proceeding, *see Moss v. United States*, 323 F.3d 445, 456 n.15 (6th Cir. 2003), serves equally well in protecting a defendant's Sixth Amendment rights here, in the case of a multiple representation, i.e. representation of more than one co-defendant in separate trials. *See,*

particular measures must be taken, and the district court is provided with considerable discretion in making that determination. *See Wheat*, 486 U.S. at 161; *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008).

In order to balance these interests, a court must determine whether an actual or potential conflict exists, which the court must then address by requiring waivers, partly limiting counsel's involvement in certain aspects of the defense, or disqualifying counsel. *See Wheat*, 486 U.S. at 159. Where only a potential conflict exists, the Court must determine the likelihood the potential conflict will actualize during trial. *See id.* Remote, unsubstantiated possibilities are not sufficient to require disqualification, but a court need not be certain a conflict will arise to determine it is sufficiently likely to require new counsel. *See* Fed. R. Crim. P. 44 advisory committee's note 2 (1979 Amendment) (citing *United States v. Carrigan*, 543 F.2d 1053 (2d. Cir. 1976) ("a conflict exists to the degree that a defendant may be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the Sixth Amendment")); *Wheat*, 486 U.S. at 162-63. The district court must determine whether the possibility and severity of a conflict warrants action, up to and including disqualification of counsel, without the benefit of post-trial hindsight. As a result, the court is given "substantial latitude" in its determination. *Wheat*, 486 U.S. at 163; *accord Swafford*, 512 F.3d at 839; *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995) (The "standard of review of a district court's decision regarding disqualification of counsel is a generous one.")

---

*e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 352 (1980) (utilizing Fed. R. Crim. P. 44(c) for multiple representation of co-defendants in separate trials); *United States v. Agosto*, 675 F.2d 965, 970 (8th Cir. 1982) (Fed. R. Crim. P. 44(c) "establishes a suitable framework for the district court's exercise of responsibility in assessing possible conflicts" "where an attorney representing a defendant has previously represented codefendants or trial witnesses.")

**B.     Waiver**

In some cases, a defendant, knowledgeable as to the nature and potential consequences of the conflict, can waive a conflict in order to retain his present counsel. *See Swafford*, 512 F.3d at 839. Where a defendant waives his rights concerning a conflict of interest, the court must make two determinations. First, the court must determine whether the waiver is sufficient, and the defendant is aware of the dangers of the conflict and the ramifications of the waiver. *See United States v. Osborne*, 402 F.3d 626, 631 (6th Cir. 2005).[6]

Second, the court must determine whether the conflict of interest is of the type which can be waived. In this regard, the court must determine whether the defendant is capable of fully appreciating the extent of the conflict, and also whether the conflict infringes upon the court's own interest "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160 ("Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representations."). If a district court determines such institutional interests are jeopardized by the multiple representation, the court can disqualify counsel even when a waiver is given. *Serra*, 4 F.3d at 1353; *accord Swafford*, 512 F.3d at 839 ("In situations where a potential conflict of interest may arise, the court's interest in the integrity of the proceedings may trump the defendant's choice. Whether the client waives his right to conflict-free representation is not dispositive, as district courts have the ability to prevent a

---

[6]Specifically, a defendant must be informed of the particular *types* of conflicts of interest that might arise; of the specific risks associated with such conflicts; that joint representation might limit his or her ability to obtain a favorable plea agreement; and that joint representation might result in a lengthier sentence.

conflict not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.") (citation omitted).

## III.    APPLICATION

In making its determination, the Court balanced Defendant's qualified right to be represented by counsel of his choosing with his right to a defense conducted by an attorney free of conflict and society's strong interest in the credibility and respect of the judiciary, and its interest in assuring fair legal proceedings, conducted in the ethical standards required in the legal profession. *See Wheat*, 486 U.S. at 160; *Serra*, 4 F.3d at 1352. The Court considered the nature of the conflict; the likelihood problems would arise from the conflict during counsel's representation; and, the seriousness of the consequences of the conflict. *See Swafford*, 512 F.3d at 839.

### A.    Conflict of Interest

The evidence presented to this Court strongly indicated Defendant was involved in a conspiracy with Musick to distribute cocaine, which involved the possession of firearms (Court File Nos. 117, pp. 2-3; 136, pp. 1-3). From the evidence one could readily conclude Musick was higher in the chain of command of the conspiracy. The evidence also demonstrated Defendant and Musick had a continuing relationship, and Defendant provided Musick with money while he was incarcerated on at least one occasion (Court File Nos. 117, p. 2; 158, p. 11). Because Moncier was representing Musick in his case which was pending appeal, Moncier had continuing obligations to seek the best interests of Musick; this created a conflict with also seeking the best interests of Defendant both before and at his trial where the statements, actions, trial and appellate strategies,

and cooperation with the government of one client would affect the other. Moncier would face a conflict, not only in executing such strategies, but also advising either client as to whether various strategies and actions were in his best interest.

Furthermore, Moncier had made no real effort to explore Defendant's potential for a plea agreement or to cooperate with the Government (*see* Court File No. 122, unnumbered p. 15). This, in itself, is strong evidence of a conflict. *Hall*, 200 F.3d at 965 ("Foregoing plea negotiations is proof of an actual conflict.") "Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest." *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987) (citing *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978)); *see also Newman v. United States*, 1998 WL 553048, at *3 (6th Cir. 1998); *Mannhalt v. Reed*, 847 F.2d 576, 582 (9th Cir. 1988); *United States v. Lopez*, 989 F.2d.1032, 1043, amended and superseded by *United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993); *United States v. Balsirov*, 2005 WL 1185810 (4th Cir. 2005); *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991). Fulfilling this obligation requires more than simply sitting back and waiting to see what the Government offers.

### B. Consequences of the Conflict

Due to the nature of trials, no court can predict exactly how a conflict of interest will manifest itself in any given trial. *See Wheat*, 486 U.S. at 163. However, the nature of Moncier's conflicts highlighted several very serious concerns. First, Moncier appeared to make no real efforts or have any interest in pursuing a plea agreement for Defendant. This was particularly troubling because Defendant expressed to the Court an interest in a plea agreement (Court File No. 158, pp. 45-47). The Court's concerns were magnified when, after removing Moncier as counsel and asking

whether Defendant would like counsel appointed to represent him, Defendant answered: "I'm not quite sure, Your Honor. I'll have to see if -- exactly what the situation -- see if my family can afford another lawyer or see if -- or see whether or not I need an appointed lawyer, or *if the government's willing to offer a plea bargain. I'm still not sure what the offers are, to be honest,* Your Honor." (*id.*, p. 68) (emphasis added). Defendant not only was interested in a plea offer, but he was oblivious to whether there was such an offer and, if so, what that offer might entail.[7]

Second, as a consequence of the conflict, Moncier not only was incapable of effectively addressing any issues relating to Musick at trial and any testimony Musick might give at trial, but was also incapable of making the determination whether, solely in the best interests of Defendant, Musick should be called to testify. This is further illustrated by Moncier's representations that Musick would not be called as a witness, made so early in the process (*See* Court File Nos. 137, unnumbered p. 2; 158, pp. 60-61). Such a representation is surprising considering the developments that can unexpectedly occur before, during, and after trial. From some of the submissions of defense counsel, it appeared Musick was in a position to refute some of the Government's allegations regarding Defendant. If this is true then the possibility of Musick being called as a defense witness would have to be strongly considered. These are serious conflicts and call into question Moncier's ability to provide Defendant full and competent legal services.

---

[7]Furthermore, Moncier's arguments that Defendant was sufficiently advised concerning potential plea agreements by his former attorney, prior to Moncier representing Defendant, was confusing. Plea agreements may be proposed and accepted at any time during the pre-trial, trial, and even post-conviction phase. A defendant cannot be advised about plea agreements once, but must continuously be apprised of his options in that regard throughout the process. From defense counsel's argument, it appears he made no effort personally to ascertain the status of any plea negotiations and did not reach out to the Government to verify the status of any such offers or to re-engage the process.

Furthermore, the Government represented that evidence was still developing, and it was unclear whether Musick would need to be called as a witness, or to what extent evidence involving Musick would be used (Court File No. 158, pp. 5-6). The Court had no crystal ball to determine whether Musick would actually be called as a witness or whether evidence involving Musick would be central to the case presented by the Government or by Defendant. However, Moncier's duties as Musick's legal counsel caused serious, unavoidable conflicts if Musick had any involvement in the charges against Defendant.

Third, in a conspiracy charge, often a defendant's best, and perhaps most obvious, defense is to diminish his role in the conspiracy by accentuating the significance of the roles of other conspirators or by providing information which indicates the presence of additional members of the conspiracy. Here, at trial, Defendant's best defense may very well have been to assert Musick was a co-conspirator in this conspiracy; that Defendant's role was minor in comparison; or, that Musick was counseling, dictating, or otherwise controlling Defendant's actions in the conspiracy. At sentencing, Defendant may have wished to assert Musick was responsible for recruiting Defendant into a drug conspiracy, and that Defendant was less culpable because, but for Musick's influence, he would not have been involved. Moncier, representing both parties, would have been unable to fully consider using such arguments; would have been precluded from strenuously making them; and, would have been limited in his ability to provide evidentiary support for such arguments - all because he was conflicted between his duties of loyalty to both Defendant and Musick.

Fourth, the conflict of interests between Defendant and Musick would be further exacerbated after Musick's appeal was complete. If Musick successfully had his conviction overturned, the Government would likely have been interested in securing information from Defendant to bolster

its case against Musick, or to support new charges against Musick. Moncier, as counsel for both, would have been unable to advise Defendant concerning whether and under what conditions he should cooperate. If Musick failed in his appeal, Musick would then have had a strong incentive to cooperate with the Government, including testifying against Defendant at trial, or providing information which may be detrimental to Defendant's case. With Moncier under an obligation to represent both clients, he would have been unable to effectively advise Defendant as to what was in his best interest.

Fifth, if Defendant were convicted at trial or pleaded guilty, the Court would consider various offense conduct and personal history to determine the appropriate sentence. Defendant's conduct might best be characterized by shifting culpability onto Musick. This is something Moncier could not do.

Sixth, Moncier suggested the Court address the conflicts by providing Defendant separate legal counsel to discuss plea agreements. This would not have sufficiently addressed the conflicts, and would have ultimately been unworkable. As above, the consequences of the conflict pervaded every stage of Moncier's representation of Defendant, not just plea bargaining. Furthermore, in order to advise Defendant concerning potential plea agreements, outside counsel would have needed to be intimately familiar with the strengths and weaknesses of the case, the Government's strategy and evidence, and a myriad of other factors. Moncier could not have coached outside counsel, because such information would have been tainted by the conflict sought to be addressed. As such, outside counsel would have needed to conduct his or her own investigations, research, and ultimately formulate general trial strategies to determine the likelihood of Defendant's success at trial. This, however, would still have been inadequate to inform Defendant, because Moncier would

have ultimately determined the trial strategy, and would have been free to alter it at any time. As a result, outside counsel's advice would have been nothing but a frolic of his own, because it would have had no bearing on Moncier's actual trial strategy - rendering outside counsel's advice worthlessly divorced from the reality of Defendant's trial. Finally, the Government may have sought Defendant's cooperation at any time during the process - including during the pre-trial, trial, sentencing, and even post-sentencing phases. As a result, an attorney must be able to posture a defense to allow for such cooperation, should a defendant determine it is in his best interest. Two attorneys, separately negotiating with the Government and preparing for trial, could not have done so.[8]

### C.      Waiver

Through an affidavit and during questioning at the hearing, Defendant asserted he desired to waive any conflicts which would arise due to Moncier's representation of both Defendant and Musick (*see* Court File Nos. 130, Attachment 2; 158, pp. 38-57). However, in accepting a waiver, the Court must determine both whether the waiver is sufficient - i.e. whether a defendant is fully aware of the dangers and consequences of the conflict, *Osborne*, 402 F.3d at 631; and, whether the conflict is of a type which can be waived - i.e. whether the defendant is fully capable of appreciating

---

[8]In his affidavit, Defendant expressed confidence that his counsel for his pending state court charges would have been able to counsel him adequately concerning any conflicts that might have arisen, or any plea negotiations from the Government (Court File No. 130, Attachment 1, p. 6). As the above analysis demonstrates, the conflicts here, and their consequences, could not be resolved in such a simplistic and woefully inadequate manner. Defendant's misguided confidence in the use of outside counsel, otherwise ignorant of the federal proceedings, was troubling and demonstrated his lack of truly appreciating the conflict and the dangers and ramifications flowing from the conflict. It also provided the Court with further reason for concern Defendant had little understanding and appreciation of the depth of the problems defense counsel's representation created.

the extent of the conflict, whether the conflict can be waived while still ensuring the trial can be conducted within the ethical standards of the profession, and whether the proceedings would still satisfy the interests of the public in a full and fair trial, *Wheat*, 486 U.S. at 160. Here, the Court determined the waiver was insufficient because Defendant was not fully aware of the consequences of the conflict, nor was the conflict the type that could be reasonably waived.

First, based upon Defendant's demeanor, statements, and nature of his responses to the Court's questions, it was clear Defendant did not fully grasp the nature or consequences of the conflict. Perhaps the clearest example of this, as discussed above, was the conflict's effect on, and Defendant's knowledge of, a potential plea agreement. Pursuing a plea agreement, even if it is not ultimately accepted, is a fundamental interest of any defendant. A defense attorney is obligated, not just to sit back and see what the Government offers, but to inquire as to what offers might be available. *See Hall*, 200 F.3d at 965; *McLain*, 823 F.2d at 1464. Criminal defense attorneys have an affirmative obligation to explore favorable plea negotiations on behalf of their clients and even initiate such negotiations in appropriate circumstances. *Moss*, 323 F.3d at 465.

Here, in his affidavit, Defendant asserted the Government had not offered a plea agreement he was willing to accept and that it was apparent he needed to go to trial[9] (Court File No. 130, Attachment 1, p. 3). There is no evidence of appreciation that a plea negotiation is an ongoing process; rather, Defendant ignored the ongoing consequences of the conflict by dismissing the possibility of any future plea negotiations (*see id.*). Defendant clearly did not grasp the nature or extent of the conflict. This was further evidenced when, in seeming contradiction to his affidavit,

---

[9]Also troubling, there is no indication in his affidavit whether Defendant had considered or was informed of the potential for cooperation as part of the plea agreement negotiation (*see* Court File No. 130, Attachment 1).

Defendant expressed in court that he did not know whether the Government was willing to offer a plea bargain and, if it did, what offer it might propose (Court File No. 158, p. 68). This raised serious questions with the Court as to the accuracy of the statements in the affidavit and Defendant's appreciation of the statements to which he was attesting. At the least, it was clear that Defendant did not have a firm grasp on the issues involved with the conflict.

Second, Defendant's demeanor, hesitation, cursory answers, and lack of questions created concern as to his full appreciation of the conflict (*see* Court File No. 158, pp. 41-57). Citizens place in their attorneys, much like their doctors, a substantial amount of confidence and reliance upon their advice. Defendant's answers and demeanor were more indicative of someone who had resigned himself to follow his counsel's lead without question, rather than someone who was actively considering the issues presented to him (*see, e.g., id.*, p. 48). Although trust in one's attorney is normally of benefit, a waiver of conflict must be based upon a defendant's own knowledge and understanding of the issues and risks; it is not enough for a defendant to rely blindly upon his attorney's preference.

As a result, the Court was convinced Defendant was not fully aware of the nature and extent of the conflict, and thus his attempted waiver was inadequate to address the conflict. *See Osborne*, 402 F.3d at 631; *Hall*, 200 F.3d at 965.

Furthermore, the Court did not consider this conflict, as manifested in Defendant's representation, was the type that could be meaningfully waived. *See Wheat*, 486 U.S. at 160. As repeatedly explained, the right to entertain, even if one does not accept, a plea agreement is a fundamental interest of any defendant and is a process which extends throughout the pre-trial, trial, and even post-conviction phases. As previously discussed, there is no "two-lawyer" system that

could have allowed an outside attorney to meaningfully advise Defendant and negotiate with the Government concerning a plea agreement while still permitting Moncier to serve as Defendant's counsel for trial. Under these facts, the Court could not conclude Defendant adequately appreciated and meaningfully waived the nature and extent of the conflict.

Finally, the Court must protect the public's interest in the integrity of the judiciary. The public has an interest in providing to defendants a full and fair trial. *See Wheat*, 486 U.S. at 160. This duty on the part of the court includes avoiding circumstances which would give the public pause as to whether the entire trial process is conducted in accordance with the standards of fairness and accuracy expected and whether a defendant is receiving full, effective legal counsel. Due to the previously-discussed consequences of the conflict, the public has little basis to be confident in Defendant's access to the full legal services of counsel. Having Moncier represent Defendant under these circumstance would diminish and undermine the public confidence in the trial process that is necessary for federal trials.

This concern was further exacerbated due to the nature of trial and the trial process. Moncier's conflict prevented him from fully discussing plea bargains; negotiating any potential cooperation with the Government which might have been in contrast to Musick's interests; considering whether it would have been beneficial to call Musick as a witness; and, fully investigating, producing, and developing evidence which might have further implicated Musick's involvement to minimize Defendant's role. Because these strategic considerations are based upon numerous factors not readily discernable to anyone but counsel, neither the Court nor the public had any reliable way to determine, for any given decision, whether Moncier had been and would be influenced by his conflict. This Court did not have the benefit of hindsight in viewing what would

actually occur at trial, and thus made a determination based upon the evidence it possessed. *See Wheat*, 486 U.S. at 163. As such, the Court protected the interests of Defendant and the public by removing Moncier as counsel. *See Hall*, 200 F.3d at 967; *Swafford*, 512 F.3d at 839 (A court must "recognize[] its obligation to balance the defendant's right to counsel of choice with the court's independent obligation to serve justice.").

Moreover, accepting a waiver in such circumstances would be "detrimental to independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver." *Wheat*, 486 U.S. at 162.

### D. Musick's Waiver

There is an additional issue which the Court will address. The conflict here was created due to Moncier's continued representation of Musick. Moncier sought to circumvent the conflict by asserting, without providing a supporting affidavit, "Musick has agreed for [Moncier] to represent [Defendant] and use any otherwise privileged information that may assist [Defendant]" (Court File No. 122, unnumbered p. 6).[10]

---

[10]Moncier also asserted Musick had refused to testify against Defendant for four years, and thus was unlikely to testify so in the future (Court File No. 122, unnumbered p. 6). Although it may well have been true that Musick had refused to cooperate in the past, that did not preclude Musick from cooperating in the future - particularly if his appeal were unsuccessful. Furthermore, if Moncier had continued to represent Defendant, he would have been effectively precluded from discussing or developing Musick's ability to cooperate, as it might have adversely affected Defendant. Moncier also ignored the possibility the Government could seek a compulsion order requiring Musick to give testimony regardless of his willingness to testify. The possibility of such a step would be more likely after his appeal was decided. If the Government obtained such an order, Moncier would face the prospect of counseling Musick on whether to comply with the compulsion order and possibly incriminate Defendant or refusing to testify and risk being held in contempt of court. The conflict would be unavoidable.

Musick's waiver of attorney-client privilege (1) was inadequate, (2) failed to sufficiently address the problems raised by the conflict, and (3) appeared to be improper or impermissible. First, Moncier asserted Musick had waived the confidentiality of any information he had shared with Moncier for use in the defense of Defendant (*id.*). However, the Court had no indication whether Musick waived this confidentiality with full appreciation of the nature and extent of the conflict. The Court could not blindly assume Musick was sufficiently informed when providing the waiver.

Second, Musick had allegedly waived his attorney-client confidentiality as to the information provided to Moncier. However, the Court's concern was Moncier's ability to act for the benefit of Defendant when such action would or threatened to harm Musick's interests. This concern was not limited to the sharing of information obtained through representing Musick. Moncier would still have been limited in utilizing information from other sources which may have demonstrated Musick's culpability. Furthermore, Moncier would still have been limited in arguing Musick's culpability for the benefit of Defendant. This conflict would have put Moncier in a position where he would have constantly been required to consider how any argument he made would affect both Musick and Defendant.

Third, Musick was waiving his attorney-client privilege *in ongoing litigation*. This was extremely problematic because neither Musick nor Moncier could fully anticipate how Musick's appeal and subsequent legal needs would develop, and what information and strategies might have been used at those times. This materially distinguished Musick's waiver of attorney-client privilege from cases where such a wavier was permitted, because those cases all involved waiver of attorney-client privilege by a former, not current, client. *See United States v. Cornell*, 162 F. App'x 404, 412 (6th Cir. 2006) (the United States Court of Appeals for the Sixth Circuit emphasized a lack of

serious error from the conflict where the defendant's attorney vigorously cross-examined his former-client/witness, and the witness had waived any attorney-client privilege and potential conflict of interest); *Takacs v. Engle*, 768 F.2d 122, 125 (6th Cir. 1985) (no conflict remained to prevent counsel from vigorously cross-examining a former-client/witness when that witness had waived the attorney-client privilege).[11]

In addition to the attorney-client privilege, there is a broader ethical obligation of an attorney to preserve his client's confidences and interests which fall outside the attorney-client privilege. *See Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir. 1979); *see also, X Corp. v. Doe*, 805 F. Supp. 1298, 1307-08 (E.D. Va. 1992). Put simply, an attorney has an ethical obligation not to use information he received from a client, to his detriment, for the benefit of another client. Moncier's proposed dual representation of Musick and Defendant appeared to inherently violate this ethical obligation. *See Wheat*, 486 U.S. at 160. The Court is charged with maintaining the public confidence in the legal system and preserving a defendant's ability to have the utmost confidence in his attorney's loyalty and discretion. *See Brennan's*, 590 F.2d at 172; *Wheat*, 486 U.S. at 160. Permitting Moncier a blanket approval for use of information, which he obtained and would continue to obtain while representing Musick, flew in the face of that broader ethical obligation, and clearly threatened to sacrifice one client's interests for the other's. Federal courts cannot allow themselves to be parties to such actions by permitting them to take place in

---

[11]Furthermore, both cases involved situations where the allegedly-conflicted defense counsel conducted a vigorous cross-examination of his former client, and thus alleviated any doubts as to whether the potential conflict affected the adequacy of the representation. This Court, however, had no post-trial insights, and therefore made a determination as to whether Musick's waiver was sufficiently robust and made with sufficient knowledge to meaningfully permit Moncier to represent Defendant unhindered.

proceedings over which they preside.

**IV.  CONCLUSION**

The conflicts of interest that arose from Moncier's representation of Musick and Defendant in two, ongoing cases introduced fundamental uncertainty as to counsel's ability to provide both clients with full and vigorous advocacy.  Such conflict and uncertainty caused particularly grave concerns in light of the detrimental effects these conflicts would have had on Defendant's defense, the severity of the punishment Defendant faced, and the diminishment of public confidence in the integrity of the federal trial process.  Thus, the Court **DISQUALIFIED** Herbert S. Moncier as defense counsel for Defendant.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**